May it please the court my name is David senior I represent Richard Montiel and I'd like to reserve ten minutes for rebuttal if possible. Okay keep your eye on the clock and we'll try to go. Thank you. The gateway for our discussion today is a three-sentence order issued over a quarter of a century ago by the California Supreme Court. It reads petition for rid of habeas corpus is denied. The delay in presentation of the claims has been adequately explained. All claims are denied on the merits. In a citation to Harris v. Reed footnote 10. Two quick reference points. The petition was filed in Mr. Montiel's case in the California Supreme Court on June 1 1993 and it was denied on February 21st 1996. Less than 60 days after the petition was filed the California Supreme Court advised an In re Clark quote when a habeas corpus petition is denied on the merits. The court has determined that the claims made in that petition do not state a prima facie case entitling the petitioner to relief. Therefore Mr. Montiel's petition was denied not for failing to present a winning Strickland claim at the petition stage but only because the California Supreme Court concluded before the pleading stage that he failed to state a Strickland prima facie case for relief. Less than 60 days after the petition was filed the California Supreme Court also advised in In re Harris quote one seeking relief on habeas corpus need only file a petition for the rid of alleging facts which if true would entitle the petitioner to relief. Therefore Mr. Montiel only was required to allege facts not prove facts which are taken as true that would be a viable prima facie Strickland claim. Stated very succinctly the California Supreme Court accepted as true trial counsel Roger Robert Birchfield's sworn declaration that he believed quote the only viable theory of defense was the California Supreme Court except that is true that counsel failed to investigate and present available evidence that Mr. Montiel quote was incapable of forming the specific intent required to rob Gregorio Ante. He was quote capable of premeditation deliberation and forming an intent to Mr. Senior let me let me ask you two questions about and I assume you're about to argue that therefore our standard of review is the no vote. I'm going to get there. Yes. Yeah. Yeah. That's the only reason to go through this stuff. Here's my problem with what you're saying. Let's assume for a moment that this for purposes of argued that Mr. Birchfield in the penalty phase was ineffective in a couple of those requisite standard of care. Don't I also have to read the California Supreme Court's order is saying that it doesn't think there was a reasonable probability that had different representation been presented your client. There would have been a different outcome and if it does say that which I think we have to read it as saying why does it matter then that we just then we can assume as soon as true that he counseled was deficient in all the ways you just described. If I understand the question it seems to be more of a focus on could they say in the end with respect to a certain claim there was no prejudice. Right. Because a strickling claim requires both deficient performance and prejudice. We're told by the Supreme Court I don't like this but we're told by the Supreme Court that we should read postcard denials in their broadest possible terms and think of all the reasons why the court could have reached the conclusion that it did. So I'm looking at this case and saying to myself don't I have to start from the presumption that the California Supreme Court found that you didn't satisfy the second strickling problem. And if that's true that's true how do you how do we review that finding. Well first I would say that I'll use this as an example just because I think it's the easiest. In the guilt claim. Well it does have something to do with the guilt claim too because the presumably even if we were to certify that claim to in this case it's the same question. Even if counsel's performance was deficient in the guilt phase. Why don't I read the California Supreme Court's postcard denial and say but you you haven't alleged sufficient facts to show a strickling prejudice. Well in the guilt phase if he if they accept this true he did not have the capacity for the crime. And the prejudice is he's not guilty. No I don't think we can accept this true that he didn't have the capacity of the guilt phase. All we can accept at the guilt phase is that you would apply the evidence that he didn't have the capacity. And so the question is had you put on that evidence not you but his side put on that evidence why why do why do we think there's a Okay if he puts on evidence qualified evidence from an expert and that that evidence at least at this stage of the proceedings in the Supreme Court is accepted as true. No no all that's accepted as true is that that evidence would have been presented. We don't accept as true the fact that the evidence would have been believed. There's nothing in the case law that says he's made a prima facie what he's made a prima facie case of is that his that could have established this. He didn't present a prima facie case that he was in fact disabled. We don't have to believe that he was in fact disabled do we? I believe when it says need only file a petition for writ alleging facts which if true. Which if true. So we assume them to be true for purposes of seeing whether or not they're sufficient. But we don't then assume that for purposes of the jury determination the jury would find them true. The question now is when confronted with those conflicting expert reports you say puts on an expert that says essentially there's nothing wrong there. They put you put on your experts that say oh no he had these problems. We then have to reach the conclusion of whether or not that would have was a reasonable probability that would have made a difference don't we? Okay and um based on this record if there's a prima facie showing of of prejudice in the record first we know that if you put on nothing if you do nothing you end up with a hung jury. That's what happened in trial number one. If you want to mock trial if you want to speculate as to what's the reasonable change or the reasonable outcome what would have been different. What what Mr. Lorenz did in the first trial is the state put on all of their aggravating evidence. Talked about the crime with Mankin. They talked about the crime here. They talked about Siegel's opinion. They talked about everything and in response counsel did nothing and they couldn't get a death verdict. That's how close it was. Now we move it we move ahead to the second trial. That might have been a fluke. We go to the second trial. Lorenz then puts on one witness in response to all of the aggravating evidence. Siegel's opinion once again. By the way they're also looking at it not only can they not get a death verdict they've got an improper Briggs instructional error being added to the aggravating side. They've got an improper special circumstance added to the aggravating side for financial gain and and they still still cannot come up with it. So had counsel done anything that they accept all this is true would the outcome wouldn't have changed that at all. That's number one. Number two had counsel not done what he did would it have changed as true. It's an unreasonable decision on their part. This is a case where it's right in front of them. Everything is right in front of them. It's not that he was the first jury found a death penalty the second jury found a death penalty. The second jury found a death penalty. It sounds like you are arguing that we should view what the California Supreme Court did as unreasonable. So that would get rid of this argument that we should not view them as having resolved this issue on the merits and do it de novo. I guess that's a backup argument or was that still part of your de novo argument. I think that the simplest most straightforward line through here was the application of Strickland unreasonable and absolutely it was. The prejudice side this case was was a non-death case when you put with a baseline of putting on no evidence against the aggravating evidence against Siegel's opinion against the testimony of Michael Palacio about residual doubt which was never considered in trials two or three. That close and then we have Mr. Birchfield who arrives for the third trial and announces to the jury after conducting no investigation without any strategy at all he announces to the jury that Mr. Montiel's upbringing was normal. He came from a normal family and quote-unquote ordinary environment and that was the end of Mr. Montiel's defense. No one was listening to him at all after that in light of the childhood evidence as going more to just the jury would have been more sympathetic or as giving a better explanation of the drug use than the depression explanation that was actually presented. There's a number of things that the social history evidence would have presented. One is it would have diffused the state's presentation and reference to Mr. Montiel as the That's how the jury knew him. The jury knew him by what Dr. Siegel called him. He was the devil. Then his counsel came in without any investigation and referred to his background as being normal, ordinary, and absent any explanation as to what his background was the jury didn't know who he was. They didn't understand his background and they had no idea why he was addicted to drugs, why he was intellectually disabled, why he had psychological impairments, why he was uneducated, why he had I mean the list goes on and on and an explanation of that to the jury is not to excuse the behavior. It's not to justify the explanation as to who he was and how could this horrible event have occurred. Help me understand if you can what a prepared Birchfield would have done to Dr. Siegel. I mean I read your brief and it sounds as though there was an awful lot of narrative as to what happened at the crime scene that Siegel was incorporating into his analysis that in fact really wasn't wasn't true and of course that through the the the guilt phase so tell me what would you walk me through that please. Yes if if if Birchfield had found informed, prepared, a qualified expert, the qualified expert first and foremost would have presented an opinion that was contrary to Siegel's that he had the mens rea to commit the crimes number one and number two had he been prepared properly and informed he would have realized that the complete predicate for Dr. Siegel's opinion was the testimony of Michael Palacios and that was false that was knowingly false presented by the state and it only became clear in the record seven years after they presented the false evidence. Palacios testimony is or Siegel's premise is Michael Palacios 1979 testimony of a confession that Montiel came in sat down with Mr. Ante saw money in his shirt pocket it motivated him to kill Mr. Ante and steal the money. That's the whole predicate for his opinion. Well we know. And would Birchfield if he'd done his work have known then that that was false would he have been able to say well that's not true the money was still in his pocket after he was found dead? Absolutely because it was Birchfield that called Sheriff Investigator Plendenon to the mentally phase and said what were you the first person to arrive at the scene and he said yes I was. What did you find in his pocket? $180. I might add Michael Palacios when he claims he got a confession from Montiel and he was going to get his felony charge dismissed and he read about it in the newspaper and claims he got a confession the first person he testified he went to tell was Sheriff's Investigator Plendenon. Plendenon knew in 1979 that the $180 was in Mr. Ante's pocket and it hadn't been stolen. And he says he got a confession and that he stole the money from his pocket. And I'd like to direct the court's attention to. We're getting a little bit astray here. I'm not sure. You're not really contesting that your client actually committed the crime. You're contesting that he had the requisite mens rea to commit the crime, right? Both. He did not commit the robbery and he did not have the mens rea. Murder. Murder. No mens rea for the murder. Yeah, but you're not contesting that he committed the murder. Well, you're contesting that he did the killing which you're contesting as murder. The two theories of murder that were put forth to the jury were felony murder, robbery, no robbery. That theory doesn't work. And we don't know which theory the jury relied on. Well, so here's my question. So they found money in the victim's pocket. Does that mean that your client also didn't take money? Yes. What about the pennies? Yeah, we take the narrative that turns out to be the true narrative is he takes the pennies after he goes back to the house. He does not take the money as part of the killing, which is which is the point I'm after with Dr. Siegel's testimony. He's telling the jury as part of his narrative as to his diagnosis that he killed him in order to steal money. But that's not true. So the jury has been given a false narrative as to the nature of the crime. Absolutely. And as far as the pennies go, here is the evidence. Palacios did not get a confession from Montiel that he stole pennies from Mr. Ante. That's number one. Number two, Montiel returned to the gas station with his beer in his hand, no pennies in his hand, and nothing in his pockets. That testimony comes from Victor Cordova on April 25, 79. And also from Moray Cordova. He had nothing in his pockets, nothing in his hands. That leads me to a slightly different question, and I don't know the answer to this. There was an ineffective assistance of counsel claim on direct appeal, which focused on, in part, on trial counsel's what I would call an effective cross-examination of the expert and failure to object to various things. How much overlap is there between that claim and the cross-examination claim with respect to Mr. Birchfield? Well, the overlap is neither one of them did a thing with respect to... I understand. And that's, see, here's my problem. The California Supreme Court holds on direct appeal, Cordova, that with all those facts, not doing a thing, as you represent, doesn't amount to ineffective assistance of counsel patiently with respect to the cross-examination of Birchfield, of this Siegel, sorry, in the guilt phase. So what does that, what does that have any consequence with respect to a similar ineffective cross-examination in the penalty phase? I could see where it would be different if there were things to be learned since, but if you're pointing at stuff that was known at the time that he didn't have the pennies in his hand, can we really rely on that? Well, it's a misstatement of the record. If they were relying on the fact that he had pennies in his hand to uphold the robbery, there is no evidence of that. The evidence is he took change from Ms. Mankin. The evidence is that the change that he took from Ms. Mankin was one of the few things that was never recovered. So that's why he has change. And there's no evidence when he leaves Mr. Ante's residence, if that's where he was coming from, that he had it in his hands or his pocket. There's no evidence at all. Palacios didn't have it. Now, if they're stating that, if the California Supreme Court on direct appeal is stating that he took pennies from Mr. Ante, there's no evidence to support that. No, no, they're not stating that. What they're stating is that counsel's cross-examination of the expert did not facially amount to ineffective assistance to counsel. And you're attacking a similar cross-examination of the expert at the penalty phase. I don't know whether it has any consequence or not. It just struck me that it's really the same argument that was made on direct appeal. Well, what's different and the way it's carefully phrased by the California Supreme Court is on the record before us. That included the cross-examination. That's only what's in the record. You don't know anything about preparation. That would be outside the record. Yes, I agree. I agree. And narrowly confined to that record. That's why this claim of who was raised on habeas would be broader than that. Could I ask you, just hypothetically, if we disagreed with you about the ineffective assistance claim at the guilt phase, and we start looking at the penalty phase argument, do we have a problem with the idea that the guilt phase jury found the right mens rea? How does that affect your argument that there should have been more evidence of PCP intoxication at the penalty phase? Are they basically bound by the earlier finding, or is there something more that the penalty phase could have taken from that evidence? I mean, the penalty phase, well, first of all, at the penalty phase, what the jury should have been made aware of is people don't like drug abusers. People don't like drunk drivers. There needs to be an explanation, and again, not a justification, for the behavior. And people that are doing it, Siegel portrayed a picture like he was a wild party guy. That's why he was doing it. So this goes to the childhood evidence, which I agree is very compelling. I was just wondering about the arguments that have to do with a better expert on PCP or a better cross-examination of the PCP. Those arguments seem a little bit in conflict with the holding from the guilt phase. If he had conducted an investigation, if he had retained an expert that was qualified, and if he had put them forward, the state had no burden of proof on diminished capacity. They didn't need an expert. They went aggressively and affirmatively to try to take out the obvious, as both trial counsels say, the only possible defense in the case. And the defendants responded by not putting on anyone to counter that and to undermine their opinions. It's one thing to have a contrary opinion. The other thing that Dr. Pitts did is he explained why Dr. Siegel's opinion is not well-founded. And he also would have testified that there was no robbery that took place, that the foundation for Dr. Siegel's opinion is amiss. And he also would have cross-examined him with his opinion that he rendered in Frierson, which was available, and totally contrary 100% to what was presented in this case. That opinion was out there and available, that 1979 opinion that he put out in Frierson, where he says that in this case, well, I think he was capable of some goal-oriented activity. But what about in Frierson, Dr. Siegel? He came up with exactly 180% opposite conclusion. Not only the only defense available to Mr. Montiel at the guilt phase was diminished capacity, and they didn't put it on. The fact that the state had no burden of proof of putting that on, they just tried to take the offensive and say that he knew what he was doing. Because to most reasonable people that read about the actions of Mr. Montiel, there was no question in this case, different than Avina, different than Andrews, that he had used PCP, that he'd used massive quantities of it in 24 hours, that he had drank eight to 12 beers in six hours before these crimes, and that his speech, his eye twitches, his behavior, seeing men in white coats thinking they're doctors in the streets, I mean, and then at the end, to flip a switch that says, yeah, but I've got a medical opinion. He could perform some, he would be capable of performing some goal-related activity, because according to Michael Palacios, he saw the money in his pocket, and he went and stole it. And he didn't. Any expert, any expert at that guilt phase would have tore him apart. And look, I'm not the world's greatest trial lawyer. I tried 30 cases, maybe, civil cases. Any preparation on this, and it's all in the record right in front of him. Henry Ante's testimony, the money was in his pocket. Clendenin's report that he recovered the money from his pocket, and they go on, and they knowingly present false evidence, and then buttress it with an expert's phony opinion. Right, but let's focus on what's in front of us, because you're getting, where I'd like to go is back to the guilt phase, and back to the penalty phase, and because one of the things the jury is thinking about, of course, is, well, what's mental state about the PCP, but they're also thinking about what's the nature of the crime. And this nature of the crime continues to bother me, that the jury is allowed to think that he stole money out of Mr. Ante's pocket, and that that was a motivation for the crime, when it just wasn't true. And the easiest thing in the world for a prepared lawyer, had Birchfield been prepared, would have been to demonstrate that Siegel is telling a false narrative, and that undermines both Siegel's diagnosis, but it also undermines just the narrative of what happened, so as the jury is trying to evaluate how serious the crime is. Exactly, and you know, one thing I want to mention, Judge Fletcher, is at the first trial, the guilt phase trial of May 1979, the jury was told during the penalty phase, that you were to consider all the evidence that's presented at the guilt phase. The jury at the first trial, while they're deliberating, what do they ask for? We want to reread Palacios' testimony. They heard his testimony, they saw his demeanor, they knew he was getting a get out of jail free card, they knew he read it in the newspaper, they asked to see his testimony. And this court, in its decision in Cox versus Ayers, say lingering doubt is the most important aspect at a penalty phase trial. Well, but we're talking about the first jury, right? Right. So why should we care about what the first jury did at the penalty phase in this case? Because that verdict was overturned on appeal. Well, the first verdict was out. No, I understand. But my question is, if you're arguing ineffective assistance of counsel, the only verdict on the penalty side we can worry about is the 1986 one, right? You can't be arguing there was error in the first one. And you can't be arguing that what the jury asked to hear in the first case made any difference in the last verdict, can you? Yeah, there was no lingering doubt presented at the third case. My point is, but was there any special, was there any presentation in the first case that corresponds to the presentation you now think should have been made? Yeah, the presentation in the first case should have been precisely what was made in the second case and the third case. And that is, they should have had a prepared expert and they should have attacked Siegel. Here's where I'm having trouble equating the cases. I understand your point that a jury, that the first jury hung and that they had, your argument is they must have done so because they thought about Palacio critically. I don't know whether that's true or not. But I'm not sure what that tells me about the effectiveness or ineffectiveness or prejudice of in the 1986 penalty trial. I don't know what I can draw from that because you're equally critical of counsel's performance in the first case. So you say we had ineffective counsel throughout. So I'm not sure why I should take much from what happened in the first case. Well, I mean, if you want to, and again, we're crossing over between guilt phase and penalty. Yeah, that was the problem I was going to ask. Okay, so if we're limiting the discussion to penalty phase trial, what can you glean from the first one? We know the following, that the jury, after hearing all of the evidence, after considering lingering doubt, they found that the aggravating evidence was not compelling. There was no mitigating evidence put up against it. Do you know what the split of the jury was? No, I don't know. See, that's my problem. All I can tell from the first phase is that at least one juror didn't want to sentence your client to death. I'm not sure I can read anything more from the first penalty phase than that. And it seems to me that with respect to the last phase, the real question is, did counsel perform it effectively? Not had he done exactly what they did at the first phase, would it have turned out the same way? Because your basic argument at the first phase is they were equally ineffective, but they got a hung jury. They did nothing at the first phase. So they were ineffective. You can score positive points and you can score negative points in your presentation. They got a hung jury doing nothing. That's your baseline. What he did in the second one, he called him normal. He said he came from an ordinary background and he presented incapable. We agree with you that that may be evidence of ineffectiveness at the third phase. We're talking across each other. I'm just not sure what inference I get from the fact that there was a hung jury at the first phase when counsel did nothing. Let's do this. Mr. Senior, you sought to preserve 10 minutes. We've now taken you absolutely up to the time and 54 seconds past the time. Let's hear from the state and then we will give you a chance to respond. Thank you. Ms. Hawkins, is that how I pronounce your name? Yes, Your Honor. May it please the Court, I am Supervising Deputy Attorney General Julie Hawkins, appearing on behalf of Respondent Appelli, the State of California. The District Court correctly determined the Petitioner is not entitled to federal paid disrelease. In particular, the State Court reasonably rejected each of the claims of ineffective assistance of counsel the Petitioner brings before this Court, including the two certified claims, claims 24 and 25. Today, the State will limit this argument to certified claims unless the Court has any questions with respect to the uncertified claims. I have a preliminary question. It's a postcard denial, right? Right. You're not claiming that there was any procedural before? We are not. Okay. If you're not, I don't want to know why you're not. Okay, because I saw the length of the earlier question. I think Petitioner's misunderstanding is what the Court has to accept as true. No, no. Yeah, I'm going to get to that. Because I don't know how to read the Harris versus Reed citation, but you're not contending that it's an independent state ground? No. Okay. No. In fact, I can see exactly why you're not doing that, because if it's a procedural fault, and then we get past the procedural default, then you don't get deference. You'd much rather this be on the merits. I get it. Well, right. But also, of course, as we said, on the merits. That's what, this is all preface, because had you argued differently on this, we might have a different approach, as Judge Fletcher says. Okay, so now we have this postcard denial. How are we to read it? Are we to read it as a rejection of the merits of his claims, or simply that he hasn't sufficiently pleaded ineffective assistance of counsel? The latter, that taking these facts as true, he has failed to state a prima facie claim. And is that on both Strickland prongs? Yes. Okay. Under Harrison versus Richter. Well, do we have to assume it was both? I mean, maybe they assumed one and only reached the other? We have to assume it's both, because for petitioner to prevail, he needs to show that neither prong of Strickland was found. Right? So- Correct. And there are cases like that, where the court expressly says, we are not, we have not considered this prong. We are eliminating discussion of this prong, in those instances, then the prong that they have not decided is entitled to de novo. Okay. So now I'm getting to Mr. Senior's point, I think, and he may, I may be messing it up for him and he can tell us later. Let's assume for a moment that they didn't think there were sufficient facts pleaded to establish ineffective assistance. Okay. And we end up disagreeing on that, that we think that, that we think there was plenty of evidence here that counsel was ineffective. How do we, how do we review their finding, their implied finding, because they didn't make it, that even if he had been effective, it wouldn't have made a difference, or there's not a reasonable probability it would make a difference. That's not a factual finding, I don't think. It's just a finding that, that, so how do we review it? Is it really entitled to de novo? I, I'm not, I'm sure I understand the first question. Okay. So let me, let me rephrase it slightly differently. You, you argue that the postcard denial by the California Supreme Court is a holding both on, on both prongs of Strickland, correct? Right. Okay. Let's assume that we turn to the first prong and contrary to your arguments, we find that the California Supreme Court's implied finding on the first prong of Strickland was unreasonable. All right. That, that there was lots of evidence of ineffectiveness here and a prima facie case of what was made. We then would have to turn to its second prong, implied finding, which is that there is no prejudice. Right. How do we review that finding? I think that would still be entitled to deference. Tell me why. I don't, well, I don't think just because if this court disagrees that it decided the first one pronged unreasonably, that it necessarily eviscerates the second holding so that we have to look at it de novo. I don't think you could just assume that both were unreasonable. No, I'm not assuming both. Okay. I'm just saying, I'm just, I'm, I'm, I'm posing a hypothetical. All right. The three of us go back in the room there and we say to each other, well, we think the California Supreme Court was unreasonable in finding that this guy received effective assistance. Okay. Now we have to turn to the prejudice issue and the California Supreme Court, I guess, according to your view, found that he hadn't pleaded sufficient evidence of prejudice because they didn't make a factual finding. It was a finding on the face of the petition. How do we review a finding that somebody hasn't pleaded sufficient evidence of prejudice? Well, um, if taken as true, yeah. Okay. We're missing each other. Let's assume that we, we've made this first finding and we say you're unreasonable in finding that he received effective assistance. Right. Now I look at all the facts pleaded and those facts suggest to me that there's a reasonable probability that the jury would have come out differently. So if I were sitting as, as a judge on the Supreme Court of California, I might've found prejudice. But we're federal judges and we're bound by ed. So how do I review this finding, which is plainly just a legal finding. It's just what on the face of the petition, is there enough to establish a prima facie case of prejudice? Don't I review that? I don't believe that. I still believe it's entitled to review for reasonableness and I'm having a problem. I, I, I'm sorry. I feel like insufficient, but I'm not understanding your question because I'm sure it makes sense. Let me give a try. Let me give a try at the question. Whether or not there's a prima facie case is different from whether or not there is a proven case. If the, if the California Supreme Court has said, we've looked at all the evidence, we've evaluated all the evidence, and we think that any ineffectiveness of the council was harmless, unrestricted. So it fails on the second problem. That's one thing. On the other hand, if they say that, well, we looked at the evidence and it is not even a prima facie case. Well, a prima facie case is really easy to satisfy. And it might be quite unreasonable for the California Supreme Court to say there's no prima facie case on this evidence. Whereas it would have perfectly reasonable for the California Supreme Court to say, well, we've looked at all the evidence. We've evaluated the evidence and we don't find harm. So what do I, what am I supposed to do with that? You're, you're saying that if you review, if you find the finding of the prima facie case was unreasonable. Right. And that's the only thing that they did. Okay. They were then I think it would be done all of them. Yeah. Okay. Bingo. I mean, I, yeah, I, because otherwise if they had found the time to face it, then it would have gone to an evidentiary hearing. We would have had, you know, we would have had further development if we didn't even get there. Then I think I'd have to say that it was, you know, it was, you know, and so did the California Supreme Court only say that we find no prima facie case? Is that what the postcard denial means? Yeah. So in other words, in other words, they didn't evaluate the evidence and conclude based on the evidence. They just said, this is a prima facie case. And if I think that's unreasonable, I don't get to the question as to whether or not it's unreasonable. Had they evaluated all the evidence. Okay. So yeah, with judge Fletcher, having saved my question, let me ask the question I was going to ask. Why, why wouldn't we conclude that there was at least a prima facie case here of ineffective assistance in Kansas? Because you have to weigh what the statements in the declaration are against the evidence at trial. And if in the declaration, like Mr. Pitts' declaration, he says a petitioner lacks the capacity to form the intent to kill or to steal. Well, that doesn't make out so that he lacks the capacity to form the intent to steal or kill. No, I understand all the, all that it means is that, is that able counsel might have presented Dr. Pitts as a witness at trial or at the penalty So if he, so help me evaluate the record in that way. If that witness had been presented at either of the phases, I know we didn't certify the adult phase. Why isn't there a reasonable probability that the outcome might have been different? Because of all of the evidence from the time of the crimes showing that he did have the intent to kill and steal at the time of the crime. And the evidence I'm going to recite now, this comes from the 1979 trial, the guilt-based trial. So this goes to the claim of guilt, but it's also relevant to the decisions that Mr. Birchfield made and whether or not to present a lingering doubt as to guilt theory in the 1986 penalty phasing trial. But the evidence in the 1979 trial is to the following effect. First of all, mere hours before petitioner killed Mr. Arante, he demanded and then grabbed Eva Mankin's purse from her person. As he ran from her house, he specifically removed from the purse two checkbooks, three bankbooks, a small knife, and $8 of cash before discarding the purse. He was very focused to take. Upon thereafter arriving at the home of his friend, Victor Cordova, petitioner said he did a purse snatch. He gave a checkbook to Cordova's wife, and he asked her to cash some of the checks so that he could buy clothing. Petitioner left the Cordova residence on the back of Cordova's motorcycle, seated behind Cordova. When the motorcycle's chain broke and Cordova stopped to try to fix it, petitioner wandered off on foot. When he returned, he told Cordova that he just killed a man, and that he did it like you do a goat. That's not what he said. Cordova says like he killed a goat. He didn't say it. I don't know if the record's clear whether... Cordova testifies he drew his finger across his throat, and then Cordova says like he would like to kill a goat. There's some instance there isn't selling clarity to me, but I would say that is true, is that that was that was Cordova's word, but the fact does remain that Mr. Arante's throat was slit from ear to ear. He wasn't just stabbed in the neck, as petitioner says. Continuing on, petitioner told Cordova that he had left two beer cans in and asked Cordova to retrieve them. After Cordova refused to go and retrieve the beer cans, petitioner again left on foot. This time, he was given a can of beer and a paper sack. When Mr. Arante's body was found later that same day, the left pocket of his pants was pulled out, and there was testimony from his family members that he did have cash in that same pocket when they last saw him. The only cash he had on this person was not the cash in the pocket of his t-shirt that was not taken during the crime, but there was money that was missing from this person that had been there before. I wanted to ask you a question about that and see if I read the record correctly. The money that was found on this person was in a pocket on a t-shirt? Yes, it was a t-shirt pocket. He had over it, I believe, a Pendleton shirt. You said he was wearing a shirt over the t-shirt? Correct. And the money that was allegedly taken apparently came from a pants pocket? He had money in his pants pocket. His grandson had come beforehand to borrow some money to go buy the victim a plumbing problem or something. Let me just cut you short. Was there any evidence that tied the money that the victim had borrowed to the amount of money in his shirt pocket or pants pocket? How much did he borrow? No, the victim didn't borrow, but you mean his grandson borrowed? Yes. I don't know the exact amount, but I just know that the testimony must be effective. There's still money in there. He's getting money out of his pocket and then he... Okay, that's what I want to focus on. He goes in his pocket to loan his grandson some money. Correct. Does his grandson say he then puts money back in? That's my recollection. Yeah, I wasn't sure about that. The grandson says he takes money out of the shirt pocket. He had $200 and he gives the grandson 20 bucks and he puts the 180 back in his t-shirt. Correct. That's the testimony. The grandson doesn't say he takes money out of his wallet. He takes money out of that $200 he has in his t-shirt. I have to go back and look at it and difficult for me to do right at this moment, of course, but my recollection is that there was indeed, the grandson testified that there was money in that pocket. Mr. Aude, he had money in his pocket, the $200 in his pocket, because he had sold a piano. So he had $200 and he put it securely in his pocket. That's not to say that he always carried all of his money. To make it clear, in the t-shirt pocket? In the t-shirt pocket, correct. And we know he gave 20 out of that to his grandson. Correct. That's where, right. So I'm not trying to focus on what testimony there is that he had money elsewhere on his person. And so tell me if you remember him, obviously you may not remember, what testimony was there that he had money elsewhere? My recollection was that there was some testimony from the grandson to the effect that he pulled some money out of his on this record that that was the shirt pocket because he had $200 and he was found with 180 and gave 20 to the grandson. So there may not be any testimony. I don't know that it makes a difference. I'm just trying to recall. And I don't remember from the record whether there's any testimony at all about what he might have elsewhere. There is the pocket turned inside out when the victim is found. Right. And that leads to the implication that something was taken from but I'm working backwards to see whether there's any evidence. His other pocket was turned out, you know, it wasn't like he had pulled everything out looking for money. It seems that he pulled out, he saw the money as Michael said that petitioner said to him, maybe he had the pocket wrong or maybe, you know, maybe his memory was not right of which pocket he said or maybe petitioner didn't say it correctly to him. But I don't think there's ever been the finding made in any of the courts that have considered this case that Michael Plass's testimony was false. It might have been, it may have been attackable because money was attacked. Yeah, money was found. That's my next question. Was the Palacio testimony attacked in front of the jury? Well, I disagree with the difference of reading of the record. And in what way do you disagree? I want to make sure I am. I am totally confident that there was evidence that there was money. It's that there was money in that pocket, in the front pocket. Well, but what I'm after is what's the narrative that the third jury, the third penalty phase jury heard as to robbery versus the evidence that was there and the evidence that was available to challenge the narrative that Siegel gave. Well, but guilt was not an issue at the penalty phase. Of course it is at the penalty phase because the jury is going to evaluate the heinousness of the crime against various sorts of mitigating ideas. And it may or may not be sort of an aggravating circumstance in a formal sense, but the jury always looks at how bad the crime was as they're trying to figure out what the penalty is. And if the crime was, well, he was high on PCP. He was totally out of his mind and on impulse, he slit the guy's throat. And then he comes back out and babbles about beer. That's one thing. On the other hand, if he would had within his capacity, I see some money in the guy's pocket. I'm going to take the money out of the guy's pocket. I'm going to take it. I'm very differently. Correct. Right. And so Siegel led them to believe that he stole the money and that was part of the crime. But the question of the jury and whether the question was whether or not intoxication was a mitigating factor in this case, not here, but you see, you're not taking my point. It may or may not be a formal mitigating factor, but it's something that the jury will suppose the death penalty. It doesn't have to be a formal mitigating circumstance. I'm most concerned about a whole other topic, which I know you said you didn't want to talk about the non-certified issues, but I'm very troubled by this pesticide exposure evidence and other childhood background evidence that was not investigated, which seems like deficient performance and which could have had an effect on the jury, which seems like prejudice. So could you speak to that please? The short of it is, is I respectfully don't find the, that evidence as compelling as your honor does. I compared this case and looking at the cases that petitioners counsel cited Athena and Andrew. And in those cases, you had a defendant who went off, at least one of them went off to a group home and was sexually abused and physically abused. The other, the other defendant in the other case, I'm not totally familiar with the record offhand, but there were some really, really bad things. But whether or not it would have been compelling, whether or the jury might've reached a different verdict, how can we excuse the failure of counsel in the, in the penalty phase trial to even go out and investigate it? I surely that falls below. I'm not defending that. I'm saying, no, I'm, I'm, when we look at the prejudice. Okay. So let's assume that it falls. You're not defending it falls below the standard of care. So your argument is, well, you've got to look at other cases where we grant the totality of the aggravating factors in this case, not only the nature of the crime, but also petitioner's history of prior violent conduct and incarcerated though. Right. And when he was off of drugs, he was apparently a good prisoner. And before he started to take drugs. Correct. So it seems like it could have made a difference to say, look, this person had a very sympathetic background and is safe in prison. Wouldn't those be reasons to not give him the death penalty? If, if the jury weighed that again, it's under, I can't say it's inconceivable that the jury may reach that conclusion. I'm looking at the current county jury here. There's a lot of pesticides in that County. And I don't know if there was anything that remarkable about his upbringing that really screened for that. This would have been so that you should be spared. This is one of those strange things that happens to us in these death penalty cases. We're being asked to predict whether a jury, which could have chosen not to sentence them for debt to debt for any, any reason. It didn't have to be a good reason or a bad reason. We're being asked to predict whether or not information that was withheld from it might've made a difference. And I have no idea how to make those predictions, but it does seem to me that it's relevant. I'm not, I guess I would agree it is relevant. I just don't, I'm not the opinion that it's not compelling that. We have to look, it was, I don't think it was that compelling, but also we have to keep in mind that we're not looking at this. Well, I, I would say we're not looking at it, but it seems like maybe we are looking at it earlier, but that depends on going back. That's saying though, that the court agrees on the first one was sick. When that's the California Supreme court was unreasonable in finding that in which I've already said that you couldn't defend the lack of investigation of the childhood. I mean, that is unreasonable, right? It's to say that it's appropriate performance to not even investigate his childhood. I, I did say that. Yeah. You're probably right to say that too. Saying it, it seems to be obvious. Yeah. But now I'm still going to though that, you know, I've been doing like the mental gymnastics in my mind of what that means of whether or not it's just on the penalty phase for a moment, not the, not the guilt phase at the penalty phase, your argument. I take it. I want you to defend it. So let me say, well, I think it is that even if this evidence about his childhood and upbringing had been admitted, there's not a reasonable probability that the jury would have reached a different conclusion because that's the Strickland measure. Right. So how do you defend that? Tell me why because again, personally, I don't find that evidence that did not come in about, you know, the pesticides and his father may be engaging in domestic violence against his mother. I mean, these are all troubling, but I don't think though that it's right to the level where it's going to take away the egregiousness of the crime. Also petitioner's history of he had efforts, he had people made efforts to, you know, overcome his drug problem, but he persisted in it for years and years, you know, he committed crime after crime. So now add to that, the evidence that Habeas council said to the California Supreme court about mental state that I would have admitted or should have been admitted, but wasn't. Let's just assume for a moment. Again, I know you don't want to assume this, but just assume for a moment again, that the council is ineffective in not presenting that kind of evidence. Yeah. And all that together, is that enough to get us to the reasonable probability level? I don't believe so because I think that the evidence of lack of capacity was so undercut by the evidence of the circumstance of the crime. And also if that, that evidence was not as strong as the 1986 penalty based retrial, but that is in part because it wasn't an issue. The prosecution didn't have to come back with all of the evidence that could show that circumstances of crime that showed intent. So, you know, I think it's really speculative to say, well, if a doctor was the opinion of same opinions as Dr. Pitt to come in there and said that he lacked the mental state that prosecution wouldn't have come up and offer more evidence similar to what it had offered at the 1979 trial. So is that an argument that, that whether or not he did it wittingly, it might not have been an unreasonable strategy to stay away from that stuff because it would have opened up the penalty phase or description of the crime. Correct. Well, let me, let me ask this. How did Dr. Siegel in his narrative and then diagnosis in the third penalty phase, how did Dr. Siegel describe the crime? Dr. Siegel, well, he related a micro philosophy of testimony of it. Right. So the jury's, the jury's understanding of the crime at the third penalty phase is actually potentially very different from the jury's understanding of the crime at the first penalty phase when the jury actually heard the guilt phase. So it might actually have been very much to the advantage to open up what happened at the guilt phase, because at the guilt phase, there was a fair amount of doubt, maybe even to the point of disproving it, that the policy or narrative that this was a theft. And the jury at the third, third penalty phase, they didn't hear a word about that. All they heard was from Siegel that he stole money and then he killed him. Your Honor, that seems to be countered other than the true finding that that jury, the same jury that was, heard the first penalty phase trial had just returned a certain, just a circumstant finding. But the third, but the first jury hung. Right. Correct. Yeah. So that jury having heard the evidence isn't the crime and having heard essentially no mitigation whatsoever, they don't even hear the evidence from, or the equivalent of the evidence from Dr. Nuremberger, they hang. Now, of course, different juries do different things. I get that. And I take it your point is that the special circumstance they found was pecuniary gain or the robbery. So they must have believed. Correct. Correct. But that might have been, of course, depending on the penalties afterwards, rather than stealing money out of the pocket. I don't, I don't know. Again, I'm again, my argument is premise on that the money was taken from the, from the front pocket. Do you have a citation to the record for that front pocket testimony? I, if you wanted to, if the council wants to give his rebuttal and I could look for it so it's not to be a distraction. Let me ask you a simpler question. Is it in the record before us? I believe so. The trial testimony is in the record before us. Oh, I would believe. I thought it was recited in the opinion. I know what was recited in the opinion. I'm trying to figure out but that isn't the record before us because that is in certified records. Excellent. It's a record, right? Okay. And it would have been occurred during the testimony of who? I know what one of his children, one of his children or grandchildren, one of Mr. Count's children or grandchildren. Okay. If you can find it terrific, but at least you've given me now where to look for it. Okay. All right. I will look for it then right now. And when I'm off camera, is that what you would like me to do or? Well, I don't think we know what's in the record. We can find it. I don't think it's worth taking argument time for you to look up the page site. I mean, we know how to find it. All right. Are there further questions from the state before we finish up with the state? Okay. Thank you very much. Now, Mr. Senior, you'd sought to preserve 10 minutes. We took away all 10 minutes plus a little bit. Let's put five minutes on the clock and then we'll see what happens. Okay. I just want to respond. We don't want to cut you off prematurely in a case like this. I shouldn't say in a case like this. I'm generally quite soft-hearted in terms of time limits. If somebody's got something to say, I want to make sure they say so. Please go ahead. Okay. The sites for the money, and these are the facts. Henry Ante, who is his son, testified in 1979, April 30th, that he received $200 from his daughter for the piano sale and placed it in his left T-shirt pocket. That's at RT-248 ER-591. Mr. Ante, Gregorio Ante, then gave his son Henry $20 from his T-shirt breast pocket to go buy plumbing parts after digging through his two pants pockets. He didn't have the money in his two pants pockets. He had $12. He gave him the $20. That's ER-591 RT-249, again, April of 1979. Mr. Ante was wearing a Pendleton shirt over the T-shirt, buttoned to the top. That's in the preliminary hearing testimony of Sheriff's Investigator Clendenin, February 7th, 1979. It's at CT-161 ER-635. Seven years later, Officer Clendenin says $180 was found in Ante's pocket. That's ER-404 RT-546. No money was taken. Siegel's testimony... What about the $12 you just talked about? He said he didn't have the money. He had $12. Where's that money coming from and where'd it go? We don't know. We don't know. No one has testified that he took it. No one testified that he had it. No one testified that they saw him. No one testified that he was motivated, showing goal-related activities to go... Palacios does say that your client said to him, I took money from the men, right? Right. Palacios says that he took it from, he saw in the shirt pocket. Does Palacios say in the shirt pocket? Yes, he does. Yeah, yeah. Now, the Palacios testimony... RT-133. Okay. Now, tell me about, is there any evidence of a wallet later? Wallet? The victim's wallet? I don't think. I don't remember any discussion about a wallet. Counsel mentioned something about that. So, what we have is a back pocket that's pulled out, but nothing that suggests what was taken out of it. Is that fair? Or if anything was in there. He had $12 in there, $2 in one pocket, $10 in the other. He pulled out both pockets. Then he went to the t-shirt pocket, peeled off a $20, gave him the $20. Okay. And... Back up to the top. The $12 is not there later, correct? I don't know. I know nothing about that. Well, the testimony is that what they found on the victim was $180 in the shirt pocket, right? That's the testimony in 1986. Right. And the testimony about the $12 is not that it was given to the grandson, but that he looked in those pockets and saw that they only had 12. So, he went to a shirt pocket. Is that fair? Correct. And there's no further discussion on what he did with the $12, whether he put the pockets back in or what. Okay. The pocket that's pulled out, though, is one of the pockets in which either $10 or $2  that there would have been the son's testimony. The son's testimony. I'm sorry. There would have been some money in one of those pockets. And when the victim is found, the pocket is pulled out and there's no testimony that any money is found. Correct. And there's no testimony that any money was taken. Yeah. Okay. I'm just trying to figure out what the record says. And then that ties into Siegel. If you had an expert, if you had a qualified expert, and if you prepared him, when he says in 1986, which is consistent all the way along with his testimony in 1979, Mr. Montiel was capable of goal-related activities, goal-directed activities, according to Michael Palacio, close quote, two times he says that, according to Michael Palacio, he formed the intent to kill him when he saw the old man with the money, close quote. Yeah. And that's demonstrably contradicted. Demonstrably contradicted. Now, back to the issue of prejudice at the California Supreme Court. Is it contradicted because he couldn't have seen the money? Because the shirt was buttoned? Or is it contradicted because he didn't take all the money? No, it's contradicted because he couldn't see it. And it's contradicted because he didn't take anything. Well, see, that's where I'm having some problems. The record seems to suggest that at least $12 that the victim had beforehand wasn't found on him later. And the record's quite clear that your client killed the victim. So what I'm trying to figure out is how much of this testimony is contradicted or whether it's just that it would be unreasonable to assume that he wouldn't have money out of the shirt pocket had he seen it. First of all, there's no evidence that he went into his pants pocket, that Mr. Montiel went into his pants pocket. There's evidence that Mr. Ante went into his pants pocket. And there's no evidence that the $12 wasn't there. But if the pocket was inside out when the body was found, where else would the money have gone? Maybe it was there. The $180 was there. But the police didn't account for that $180. I mean, they said, we searched the victim and we found $180 on his purse. It's funny, seven years later, if you want to say that that's accounting for the $180 after they knowingly put on the false evidence from Michael Palacios that Montiel took the $180. What I'm having trouble with is your argument that they knowingly put on false evidence at trial as much as the evidence was not really developed consistently. I think it's a fair inference that some money was taken from the victim. It's not a fair inference that it was taken from the shirt pocket. And one of the things I'm after here is we're trying to figure out the state of mind. That is to say, it's a very different crime to have with someone who's thinking clearly enough. I see money in the old man's shirt pocket. I'm going to kill him and I'm going to take the money compared to somebody who's off his head on PCP who kills a man and either does or does not after the fact go into his back pocket. Those are different crimes. The jury was told, the third jury was told through Dr. Siegel that he saw money in the old man's shirt pocket. He kills him and he takes the money. And that evidence is, I can probably say false. I can certainly say deeply contradicted. And the jury didn't know that. That's correct. That's correct. And the missing $12 without evidence that he was motivated by it, that he had intent to steal it, that that's why he inflicted the lethal wound. It is not a robbery murder. Even if you assume that he took the $12, I think it's impossible to assume that he took the $12. And it seems to be obvious that if he did take the $12, it was after he killed the man, not before. And that he didn't know it at the time he killed him because it's concealed in the back pocket. Precisely. Precisely. And that what he was purportedly motivated by, he wasn't motivated by. Because he couldn't see it and he didn't take it. Well, the shirt pocket money. The shirt pocket money. The shirt pocket money. Wasn't motivated by it, never saw it. And that's the state's case. And that, you take that aggravating evidence off. You take the financial gain aggravating evidence off the scale. You got brig to error. And the first trial, you end up with a hung jury. The second one, you end up with a deadlock jury where the jury says, in writing, we're not coming to a conclusion on this. To say there's not an inference that if you come in with a properly prepared expert, with a contrary opinion to Siegel, whose opinion carried no weight. He wasn't getting a death sentence in trial one or in trial two. Whose aggravating evidence went uncontested in trial one and largely uncontested in trial two. And they were, again, not able to get death verdicts. That there isn't an inference that it might have been different. That if you'd gone and found an expert, properly prepared the expert and presented testimony, including all the mitigation social history, totally taken out the robbery motive, and then gone in to all the pharmacological testimony, which is he was in a fugue state. He could have performed surgery on him. He was grossly intoxicated on PCP and beer. And that he was walking around seeing people in white coats on the street. And every eyewitness that saw him had explained the condition he was in. It was so compelling that at the first trial, they didn't believe Siegel. It would have made a difference. It would have changed the outcome. And it would have undermined, if he had done it at the guilt phase, the guilty verdict. There would have been a difference. Before we adjourn, though, I should say on behalf of the panel, we've talked about this case before argument. The three of us have conferred on the following point. This case is, I'm sure both of you are even more aware than we are. This is a very old case. We're 40 years plus into this case. He's been on death row for essentially 40 years. The killing was in 1979. The trial was in 1979. We think this case might be appropriate at this time for some form of mediation to get the case over with through the mediation for the parties. We're going to ask our mediator to contact both of you to see if this would be a suitable case for mediation before we go forward and decide the case and issue an opinion. So you can expect a call from, both of you can expect a call from our mediator, circuit mediator, who is, I don't want to be too sort of patting the night circuit on the back. Our mediators are very good. And you can expect a call. So thank both sides for your argument. And we are now adjourned. Thank you very much. Thank you. Thank you.
judges: W. Fletcher, Hurwitz, Friedland